Good morning. Please have a seat. We apologize. We were still discussing the last case. Thank you for your patience and indulgence. This is 4-18-06-31. People of the State of Illinois v. Shawn Adamson. On behalf of the Appalachians, Mr. Curran. Is it Curran or Curran? Curran. And for Appalachians, Mr. Williams. Mr. Curran. May it please the Court, Your Honor. My name is Nicholas Curran. I'm an attorney with Kathleen T. Zellmer & Associates and I represent the Appalachians. I'm here to provide a brief factual background. The State's theory at trial was that Mr. Adamson and other individuals were looking for a person named James Schaefer because Mr. Schaefer had stolen a firearm from Mr. Adamson. And Mr. Adamson and these other individuals were attempting to relocate Mr. Schaefer to retrieve that firearm. The evidence was that shortly after midnight on June 18, 2016, which was the day of the shooting, Mr. Schaefer and his girlfriend, who ended up being the victim of the case, were at the residence of Enoch Dixon. At some point, the victim ended up outside alone of that residence when Mr. Adamson and two other individuals by the name of Kevin Johnson and Matthew Cook approached the residence. What happened after that is what was really the focus and what was mostly contested at trial. The State's theory was that at some point Mr. Adamson fired a shot in an effort to intimidate or force Mr. Schaefer into coming outside to discuss the firearm and to retrieve the firearm. Well, when you say that's the State's theory, why did you use that terminology, theory? Well, because the evidence was not overwhelming that that, in fact, is what took place. So Kevin Johnson testified that he heard a shot first. Okay, just to be a little more specific, are you saying that the State's, we'll call it theory, was that there was a shot outside and if there was not a shot outside, then the State's case falls apart or the State can't prove guilt beyond a reasonable doubt? No, I would not say that it was insufficient to convict. However, it was important evidence to the State's case and certainly it was evidence that the jury could have considered in determining whether or not Mr. Adamson possessed the requisite intent to commit an attempt to harm. Okay, just to be clear in my mind then, your position is not that the State had to show in order to prevail in this case that a shot was fired outside the premises? That's absolutely correct. Okay. I think the jury would have been, it would have been within the province of the jury to conclude that Mr. Adamson possessed the requisite intent based on his possession of the firearm and other attendant circumstances. I would concede that. However, the prosecution certainly relied on the fact that he did fire a shot to show that that was his intent. What do you say about the State's evidence or the State's assertion in its brief that there was evidence outside of Shaffer's trial testimony and Vasquez's statement that there was a shot fired outside? The State indicates that Mr. Dixon and Ms. Esparza in the 911 call are heard reporting shooting outside the apartment. Doesn't that support the State's theory that there was a shot fired outside the Let me back up a moment. So Dion Dixon, who I would contend was the most credible witness to testify as to what actually happened, because he was a disinterested witness who had not been charged with any offense, testified that he looked out the window and someone banged on the glass of the door. There was a window in the door. But he testified definitively that he did not believe that he thought he saw flashes, but he was unsure. So that's the first part of this. The second part is with regard to the 911 call. We know that there were statements that were being made on that 911 call that were not credible or reliable based on other other evidence at the scene. The State's and again, I'm sure counsel will correct me if I make a mistake. Was the comment made in the call that there are shots being fired? And I believe that the statement on the 911 tape was that there were shots being fired into the residence, which we know absolutely was not corroborated by any of the investigation of the scene. There was no forensic evidence at the scene to support. All that shows is they weren't fired into the residence. It doesn't show where that there were shots fired. Correct. But you do have to. Again, we're talking about the strength of that evidence. How strong is that 911, the statements that are made on that 911 call versus the wholesale admission of Mr. Schaefer's testimony when the defendant didn't have an opportunity to cross examine. And really, when you think about it, this is this is an egregious error. So Mr. Schaefer and Mr. Adamson were both charged with the first degree murder of the victim. Their interests were diametrically opposed in this case. Each of them wanted to pass blame, culpability for the shooting to the other. In fact, Mr. Schaefer, who was tried first, his whole defense was that I acted in self-defense based on the actions of Mr. Adamson. That testimony was admitted at Mr. Adamson's trial without Mr. Adamson having any opportunity to cross examine. That that's crazy. The thought that a co-defendant's testimonial hearsay could come in without the defendant having an opportunity to cross examine. And then that error was only compounded by the improper admission of Vasquez's out-of-court statements that the defendant, a few days after the shooting, told him that, or admitted to him, that he had fired the weapon, which clearly is not admissible under Section 115-10.1, the statute governing the admission of prior and consistent statements as substantive evidence. Whether we want to put the blame or assign the blame for that evidence coming in on the defense attorney or on the court, regardless, it's clear that that evidence was improperly admitted. So when you have Mr. Schaefer's testimony, the co-defendant... Just to stop you for a sec there, as far as I can tell from reading the briefs, the state really doesn't dispute that, do they? Not to speak for them, but my impression is that they would agree that the evidence, if it had been properly adjusted to, if it had been admitted under those circumstances, there would have been an error. Yes, I agree. That's the way I read it, too. Thank you. Yes, Your Honor. And to briefly touch upon that, and this is where diving into the record is critical, because the invited error argument, and I'll address first with regard to the Confrontation Clause violation, it's kind of confusing how it all played out, but essentially Kevin Johnson was testifying, and at one point he indicated that he was refusing to add an extended colloquy with defense counsel and the prosecution outside the hearing of the jury about, well, what do we do next? And for some reason, the trial judge got off on this court's decision in the case of People v. Brothers, and seemed to believe or interpret that case to hold that, well, so long as an acknowledgment hearing is held outside the presence of the jury, these prior inconsistent statements can then be offered. So if we have an acknowledgment hearing, the statements can be admitted. Even the state didn't believe that. I'm sorry? Even the state didn't believe that. That's exactly correct, Your Honor. In fact, the prosecutor commented, the judge, I don't think we can do that. Correct, that's 100% correct. And defense counsel also tried to bring out the fact that he didn't believe that that was proper. That's 100% correct, Your Honor. And they tried to do it respectfully. Absolutely. But the trial court continued on this train of thought, I think perhaps just overlooking the Constitution. Are you talking about with regard to Johnson? Is that who you're talking about right now? Yes, Your Honor. Okay, but you don't dispute that his testimony ultimately came in appropriately as far as I can tell. That's correct. Well, so then I don't understand what's the point. It sounds like the trial court was making statements that may have been inaccurate, but ultimately the testimony comes in without objection. Certainly, Your Honor. So that's correct with regard to Johnson because he did, after being threatened with contempt of court, he did comply and testify. He was thereafter willing to answer questions. The problem, though, is that immediately after that is when the state indicated that it would be calling Schaefer. And it didn't know if Schaefer would be willing to answer questions or what he would even testify to. So Schaefer came in and they underwent the exact same procedure with him where they held ostensibly an acknowledgement hearing outside the presence of the jury, during which Schaefer said, I'm not answering your questions. And so when we get to invited error, the parties were abiding by the procedure with regard to an unavailable witness in the manner suggested by the trial court. This was not an error that defense counsel induced or affirmatively acquiesced in. The one thing that can be said is that trial counsel, when the state offered to read in Schaefer's testimony, he agreed that all of it should come in. But that is not the same as inducing the error in the first instance. It seems like the timing of Johnson and Schaefer's testimony is very important to your analysis here, such that if Johnson had testified maybe three or four days prior to Schaefer, that you wouldn't be as able to rely on this argument of yours that defendant's counsel was basically relying on what the trial court had said during Johnson's testimony in not objecting during the Schaefer testimony. Is that right? Your Honor, I believe that that's true. That's a factor that plays into it. All right. Then can you just confirm the timing of Johnson's testimony and Schaefer's testimony the same day? So the acknowledgment hearing, and again, forgive me if I'm misremembering. I would advise the state to correct me if I'm not right on this. I believe that the Schaefer was brought in and put on his hands for the acknowledgment hearing right after Johnson's testimony. And then the acknowledgment hearing was held, and then it was perhaps the next day before his testimony was then actually read to the jury. I don't believe there was a separation of gaze in between the two. But I would also submit that because this was the procedure that the trial judge had recommended, the course of action that the trial judge had recommended, that in any event, it is not an error that was implied by the defendant. And certainly, I think that with regard to Vasquez and his improperly admitted hearsay statements, in no way did the defense induce or invite that error either. The state injected Mr. Vasquez's hearsay statements into the case. At one point, defense counsel objected to them when the state asked a question about whether Chief Gaines had asked Mr. Vasquez something. But it was clear defense counsel just wasn't tracking that all of it was being improperly admitted. But that's not inducing error. The failure to object is not the same as inviting error. If that were the case, then there would be no such thing as plain error. The last issue I have left, but just very briefly with regard to the ineffective assistance claim. You know, one of the fundamental obligations or duties of defense counsel is to hold the state to its burden of proof and to protect the defendant from the admission of improper, inadmissible, unreliable evidence. And so even if this is not a case where, you know, the trial court is lulled to inaction because the defense counsel didn't adequately do its job, then we have a situation where it's not the trial court's fault, it's the defense attorney's fault. He clearly was not acting reasonably or pursuant to a reasonable strategy in allowing Schaefer's testimony to come in without being given the opportunity to cross-examine it. Certainly there can be no – I cannot imagine a reason why Vasquez's statements that – out-of-court statements attributing essentially a confession or an inculpatory statement to the defendant, how it could benefit the defendant's case for that evidence to come in. This is a situation where defense counsel, if he just fell asleep at the switch, I don't know. But he didn't do – he didn't perform reasonably in this case in allowing that evidence to come in. Well, the one question that he asks seems to imply that he believes that as long as the statements are being made by his client that they are admissible. Correct. And we know that that's – So he says, now, are you – I just want to clarify, these are statements being made by my defendant. He says, yes. Okay, then. And that's exactly right, Your Honor. And that, of course, is – it demonstrates a misapprehension of the applicable law in that situation. Because, as we all know, and again, I don't think there's any dispute as to the law on this point, in order for the out-of-court statement to come in under those circumstances, the out-of-court declarant has to have personal knowledge of the subject matter of the statement, which Mr. Vasquez did not have. He was not present at the time of the shooting. And we all know that when an attorney's omission is based on a misunderstanding of the law, that means the deficient performance problem understood. And then that flows into, well, what about the prejudice? And again, here, and this is something that's laid out more fully in the briefs, more so than I can do here this morning, but, you know, the State over and over again hammered this point home that the evidence was that the defendant fired a weapon outside the residence. And if you believe that to be true, I don't think that – it becomes a very difficult road to hoe for the defense to say he did not intend to use force, which is a requisite for both mob action and attempted armed robbery. And Schaefer's testimony, by far, was the most conclusive evidence of there being a shot fired outside of that residence. And so I think that being the case, the prejudice is – Before you – you're running out of time, and I think we've still got several minutes left. You haven't talked about Mary Jo Perry's testimony. I know you believe that that was inappropriate behavior. And again, Your Honor, this is another instance in which I'm not sure what the thought process was. You know, these were – she testified to a series of events that had, from what I can see, no relevance to the charged offense. You know, she testified that on the 17th, the defendant knocked on her door while she was pregnant. I don't know what that had to do with anything, and essentially brandished a firearm in her face. And then after that, they were in the residence, and she, along with the defendant and several other people, smoked and got high. Again, I don't know what relevance that has to the case. And then there was a discussion about how the defendant was in a feud with another individual, again, who's not connected to the case, and that he had made statements to the effect that he wanted to commit acts of violence against this individual. Bullets will fly. Bullets will fly, exactly, Your Honor. Well, in the State, if I'm reading the State's brief correctly, with Mary Jo Perry, the State doesn't even assert that – they only assert that there wasn't prejudice in regards to Mary Jo Perry here. So it gets back, then, to your argument regarding prejudice in this case. Correct. Well, you say that showing the handgun is not relevant to any charge. How about UUW? But I believe that he was – and I would have to double-check myself on this – but I believe the indictment, the charge defense, was for him possessing a weapon at the time of the shooting. It just says on the 18th, and this conduct occurred just a few hours before the 18th, and the information says on or about. So it seems to me that her testimony regarding that gun would be relevant to the UUW charge. And therefore, his question – his assertions that bullets are going to fly and the like would go to this is a real gun that she saw. I mean, it seems like to me maybe that should have come in. She describes that as a black gun. He's supposed to be holding the silver gun when he's outside the house. The only testimony that she gives that has any relevance whatsoever is that the day before or sometime before, he's seen in possession of a silver handgun, which would be similar to the gun that he was supposed to have had when he was standing outside the house. The black gun has nothing to do with his possession of a handgun. I would agree with that, Your Honor. I do think that that is a very – Well, the information doesn't say that. I think that's a very interesting point that Your Honor raises. The one thing that I would say to that, though, is that part of assessing relevance is what other evidence do we have that would diminish the significance of that or the relevance, the probative value of that evidence. And because there was ample other testimony regarding the defendant's possession of a handgun, her testimony on that point, especially in light of its prejudicial value with everything that came after it and the sequence of events that came after that, was very slight. So that would be my response to that. Thank you. Mr. Curran, your time is up. You'll have an opportunity in rebuttal. Thank you, Justice.  Thank you, Your Honor. May it please the Court, Counsel, Foundation, and Tribal Audience, and the Tribal Assemblies of the State, and the voice of the Court. Just on that last part, Justice Turner was talking about the potential relevance of any of Mary Jo Perry's testimony. In regards to the firearm, do you believe that that testimony did have relevance? I mean, with respect to that specific charge, being charged generally with UUW, that's evidence of possession of a handgun, the fact that there may have been, as Counsel stated, ample other evidence of him possessing specifically a silver, I don't think that that would render, or that should necessarily exclude, evidence as to that charge, or other evidence as to that charge. I mean, I think there was also, if I recall correctly from the record, I think there was suggestion in the record, perhaps from a number of witnesses, that this particular individual, Mr. Adams, actually had access to a number of different firearms. Now, the State's principal position in this case, the defendant, first of all, the defendant raises three arguments, all of which have been forfeited. And then the fourth argument is, in effect, consistent with Counsel. Each of these arguments is resolved by the removal of the nature of the uncontested evidence, because the defendant cannot establish prejudice before the evidence was closely balanced, and thus, become the evidence that these issues have been forfeited. So, starting first with basically just a closely balanced evidence, a closely balanced argument that relates to his first three arguments, the evidence on which he had access for to find plain error. Defendant focuses his closely balanced evidence argument on a very specific element of armed robbery, that being the force element. However, he was charged with attempted armed robbery, which requires proof of intent to commit armed robbery, and that he took a substantial step towards doing so. So, although armed robbery does have an element of force, attempted armed robbery does not require the actual or attempted use of force to be completed. Now, in focusing exclusively on this force element, the defendant does not subsequently dispute that he had the intent to commit armed robbery, and took numerous substantial steps towards doing so. Specifically, defendant Mr. Cook and Mr. Johnson were searching for Mr. Schaefer for multiple days before this,  with the specific intent of taking back a gun that allegedly belonged to the defendant. There were numerous witnesses to these events, these attempts to find Mr. Schaefer. Ms. Cronick, Ms. Bailey, Ms. Schaefer. Now, after Mr. Schaefer was ultimately located at Mr. Dixon's apartment, the group of individuals, defendant Mr. Cook and Mr. Johnson, conspire via text message, telephone communication, to meet over there to get the gun back. Defendant then drives to that apartment, and further into the plan to get the gun back. He, Mr. Cook, Mr. Johnson, meet in the parking area, wait for their opportunity to go inside. When the victim steps onto the front porch, they finally see their opportunity, they take it, they approach her. But wait a minute. You say they took the opportunity to go inside? How does the evidence support that? That's why I said I misspoke. They took the opportunity to attempt to go inside. So they see that she's out on the porch, they're out in the parking lot, they see that she's out on the porch, and it appears that basically their plan is to use her to help get inside the apartment, because they don't want to force entry into the apartment. Will they tell her to text him to see if he'll come out? Yes, but I mean, ultimately they... Johnson takes her away from the actual door. Okay. Takes her away from the door, and is talking to her about getting him to come out by texting. In any event, it is clearly their intent to take... Mr. Schaefer has, over and over again, throughout this series of events, events to his unwillingness to simply hand over the firearm. These individuals, on multiple occasions, in front of multiple different individuals, are clearly evincing their intent to take this gun by force. They convene at the apartment with the intent to do so. They approach the apartment with the intent to do so. They attempt to get inside the apartment. This is the ruckus that Mr. Dixon hears, most likely that it wasn't perfectly tied up, but this is the ruckus that Mr. Dixon hears, causes him to peer through the window, where Pond sees a number of individuals, one of whom is the owner of the firearm, standing on his front porch. He then, although he has counsel noted, he says he doesn't recall hearing gunshots, but does see flashes, and then of course calls 911, where Pond either had the audio recording, or where Mr. Dixon, and then I believe her name was Miss, Esperanza, can be heard in the audio recording, talking about people discharging guns outside of cops. Now, admittedly, I think that there was suggestion in that audio recording that they were firing inside, but of course, in the chaos of somebody standing on a front porch firing a gun, it's not at all unreasonable that somebody might be seeking and believe those bullets were coming inside, regardless of in fact what was actually happening. In response to this discharging gun on the front porch, by the defendant, Mr. Shaffer fires through the door, and unfortunately takes the life of the victim, his girlfriend, his girlfriend, I guess. So, it's a safe position that there are numerous substantial steps here taken in furtherance of this armed robbery, and this focus on the, whether or not the gun was in fact discharged, I just believe that that's misplaced. Now, I guess just to be clear, the state's position here on appeal is just simply that this attempt at armed robbery was proved far before we get to the question of whether or not the gun was in fact discharged. But the evidence on that was pretty strong as well. I don't think that counsel touched on this, but Mr. Johnson, who was admittedly a lifelong, very close friend and defendant, he was initially very uncooperative at trial, had to essentially be coerced into testifying by threatening to kill him, gets in front of the jury, openly acknowledges that he's here to help defend him, he's here to help him. And attempting to help him, he seemingly doesn't understand how the felony murder statute operates in the state of Illinois, and basically describes a series of events that essentially makes the state's case for it, explaining that they convened in the parking lot, that they approached, they're attempting to get in the house, that defendant discharged the gun, because it seems that Mr. Johnson's position is so long as the bullet that took the victim's life here was not discharged from the defendant's gun, then the defendant is free of criminal culpability. So in essence, Mr. Johnson himself, in an attempt to help the defendant, basically makes the state's case for it. And it's really for those reasons that were, admittedly, the defendant did not have a perfect trial here, but of course, he's not entitled to a perfect trial. Errors may have been made. But at the end of the day, the evidence is not closely balanced on whether the defendant attempted armed robbery, or even specifically to the force element. Nor can the defendant establish a reasonable likelihood he would have been acquitted absent any number of these errors that he raises up here. And unless this court has any further questions. Well, on that last point, the admission of Schaefer's testimony, are you saying, is your argument that the state would have prevailed even if that testimony had not been presented to the jury? Yes, that's the state's position. Likewise, the state's position would be, on top of that, if Vasquez's testimony was not admitted to the jury, the state would still prevail. Yes, Your Honor. And both of those together, is that your argument? Yes. The state's central position here is that, based even exclusively on the unchallenged evidence, the evidence that is not disputed on appeal, the evidence of Mr. Johnson, Mr. Dixon, the various witnesses as to the events leading up to this, the defense, the defendant's intent to commit this armed robbery, that evidence together is sufficient just out of the defendant's guilt. And is the state conceding that Vasquez's testimony should have never been presented to the jury? I'm not authorized to concede that, but the state is not disputing that. What do you mean you're not authorized? I don't have state-determined specific authorization. But the state's not acting on a dispute at all, on appeal, to be fair. I want to ask you one more question because I want opposing counsels to have a chance to respond to this. While I was looking through Johnson, the transcript from Johnson's testimony, it appears to me on cross-examination twice, he testifies that a gun did go off outside. Do you agree with that? Yes, that's one of the state's central points. On appeal, as a defendant's own very close friend who was actively involved in this, acknowledged that he discharged violence. Okay. Thank you very much. Thank you, Mr. Roy. Thank you for your time, Your Honor. Mr. Curran. To that point, Your Honor, so Johnson, on direct examination, testified that as he was standing by the victim, he heard a shot in turn and saw a defendant putting a firearm in his pocket. He did not say that he saw the defendant fire a shot. We also know that. But didn't he clarify at some point and say he thought he shot himself putting it in his pocket? He did, but he also said that he was, and I think this is a fair inference to draw from reading his testimony, was that he was not looking in the direction of the shot when the shot was fired. And it's not disputed that Schaefer fired multiple rounds. He fired two rounds through that front door. Maybe my question wasn't specific enough. I thought I said on cross-examination. You said on direct examination. On cross, he was asked, where exactly when, according to you, Mr. Edison's gun went off, was he? Answer, he was to the side of the house. When Adamson's gun, he says when Adamson's gun went off, Adamson was at the side of the house. Was at the side of the house, well. That was on cross-examination. Adamson's outside. And not to, again, it's hard to Monday morning quarterback. This is his own attorney. I understand that. Asking a question in a leading fashion that attributes Mr. Adamson having fired the gun when that's not what Mr. Johnson testified to on direct. Well, are you saying we shouldn't consider what he testified to on cross? Well, no, no. Your Honor, I'm not saying that. Then later on in the cross-examination, the question was, and I believe as you testified earlier, according to you, when Mr. Adamson's gun went off, he was already gone from the front door. Answer, he was gone. And what I'm suggesting to your Honor is that if you, so defense counsel's questions are a summarization of what he interpreted Mr. Johnson to have testified to on direct. If you go back to direct, he doesn't testify that he saw Mr. Adamson fire the gun. He testifies that he heard the gun. I know, but your problem is he acknowledges on cross that he did see him fire the gun. So he did not, I would not agree with that. Because he does not correct defense counsel's assumption that it was Mr. Adamson that fired the gun. But Mr. Johnson himself never testified, I observed Mr. Adamson fire a gunshot. Again, on direct examination, he testified that he was speaking with the victim at the time he heard a gunshot, turned, and saw Mr. Adamson putting the gun in his pocket. Well, I don't know where you're going with the fact that we shouldn't consider what was said in cross. Now, I would agree with you that it's very odd for defense counsel to draw that out in cross-examination. Yes, Your Honor. There were a number of things about the trial that played out a little bit unusual. There are a couple of things, just quick things I would like to address. First off, the efforts to recover the gun are themselves not attempted armed robbery or attempted robbery. They're not. They may be criminal for other reasons. Mr. Adamson is not supposed to be in possession of the firearm. But his efforts to retrieve the gun that he believed to be his are not, in and of themselves, attempted armed robbery. I believe counsel stated that there were attempts to get inside the house. I don't think that the record bears that out. Nobody suggests in any of their testimony that efforts were made to open the door or get in through a window or that even any actual contact was made, any physical contact was made with the structure of the house. So that's a point I want to make. As far as the significance, again, because this is kind of a common theme, the significance of the firing of the gun, if you look at the prosecutor's closing argument, it's all about that gun being fired. And why fire a gun in an attempt to get another gun back unless it's to threaten force or to use force? Tenet Johnson also said the gun went off. Adrian Vasquez, again, he says, oh, no, the defendant didn't tell me he fired the gun. But again, consider his credibility. You heard Todd Schaefer testify, and I'm summarizing here, heard the gunshot outside. There's later reference to Mr. Adamson waving a firearm around and shooting the firearm. That was the state's, that was the theory that they presented. And one other thing on that is the jury was tasked not only with determining whether or not Mr. Adamson committed an attempt on robbery, but also whether or not his actions made it foreseeable that the victim's death would occur as a result. I would contend that firing a weapon into the air, whether or not you believe that to be true, if you believe it to be true, would have made it much more likely that a gunfight would ensue and that the victim would be killed as a result. And so there's another way in which whether or not Mr. Adamson actually fired the weapon would be probative to the issues that were to be decided by the jury in this case. Thank you, Mr. Curran. Thank you. I think this matter under advisement for the recess briefly. Thank you, counsel.